Filed 12/1/15  P. v. Castellano CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ARCHIE CASTELLANO,<br><br>Defendant and Appellant. | F069186<br><br>(Super. Ct. No. F13908798)<br><br>**OPINION** |

THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  Wayne R. Ellison, Judge.

Michael B. McPartland, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Catherine Chatman, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*]        Before Levy, Acting P.J., Poochigian, J. and Peña, J.

Defendant Archie Castellano was convicted by jury trial of willfully inflicting corporal injury resulting in a traumatic condition on his spouse (Pen. Code, § 273.5, subd. (a)).[1] He admitted suffering a prior strike conviction within the meaning of the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and serving a prior prison term (§ 667.5, subd. (b)). The trial court denied defendant's *Romero*[2] motion to dismiss the prior strike conviction, a 1991 conviction for rape in concert by force and violence (§ 264.1). On appeal, defendant contends the trial court abused its discretion when it refused to dismiss his prior strike conviction and sentenced him to nine years in prison under the Three Strikes law. We affirm.

## **FACTS**

Defendant and his wife, Sonia, who were both on parole, had not known each other long when they got married in April 2013. They lived in an apartment with defendant's mother.

In early June 2013, Sonia's parole agent, Agent Spigelmyre, could not find Sonia. She had not responded to attempts to contact her and she was not living at the address on file. Agent Spigelmyre then learned from another agent that Sonia had gotten married. And Sonia's program reported that defendant accompanied Sonia and would not let her out of his sight.

Agent Spigelmyre called Sonia and defendant into the parole office. Agent Spigelmyre and Agent Meno, defendant's agent, spoke privately with Sonia. Sonia was not fully aware of defendant's criminal history. She said she had been tricked into marrying him. She felt trapped, but believed it was not safe to leave him. He had

---

[1]     All statutory references are to the Penal Code.

[2]     *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 529-530 (*Romero*).

asked for her driver's license and Social Security card and had not returned them. He was controlling and would not let her do anything without his approval.

The agents told Sonia she did not have to stay in her situation. They tried to help her understand domestic violence and suggested she could get an annulment and participate in programs. She said she might be pregnant and did not want another child. They advised her that various services were available.

On June 9, 2013, Sonia called Agent Mata, Agent Spigelmyre's supervisor, to file a complaint against Agent Spigelmyre. Sonia complained that Agent Spigelmyre was being intrusive, especially regarding Sonia's marriage. Agent Mata could hear a male coaching Sonia in the background, so Agent Mata asked Sonia to come to the parole office to see him.

At their meeting the next day, Sonia admitted to Agent Mata that defendant had told her what to say on the telephone. She did not actually want to file a complaint against Agent Spigelmyre. She cried and said she would start a program after she took care of some things. Agent Mata saw no indication she had been physically hurt.

When Agent Spigelmyre tried to contact Sonia again, she spoke to Sonia's mother, who said Sonia had called and told her defendant had beaten her up and given her a bloody nose and a black eye. After learning this, Agent Spigelmyre and Agent Mata decided to conduct a parole search of defendant's apartment.

On June 20, 2013, Police Officer Neveu joined the two agents to conduct the parole search. Agent Mata knocked and called out for two or three minutes before defendant came to the door. He was agitated, breathing heavily and sweating. Officer Neveu handcuffed him and put him in the patrol car.

Sonia and defendant's mother were in the apartment. Sonia told Officer Neveu she did not want defendant's mother to overhear them, so they walked outside. Sonia was subdued and nervous. She seemed depressed and hopeless. When Officer Neveu faced her, he could see she was injured. Her face was bruised and swollen, especially her

3.

nose.  The injuries were consistent with blunt force trauma and appeared to be about one week old.

Sonia told Officer Neveu and Agent Spigelmyre that she and defendant had argued after she called Agent Mata.  Defendant punched her in the face, causing her nose to bleed down her shirt, bra, and sweatpants.  She explained where she hid her bloody clothes and officers retrieved them.  She said she felt powerless and isolated, like she had no place to turn.  She was afraid for her life and she begged Officer Neveu to get her out of the state.  She was afraid of any paper trail that would lead back to her because defendant would do something terrible to her.  She also said she loved defendant and did not want him to go to prison.  He loved her and treated her well when he was not using methamphetamine.

When Officer Neveu asked Sonia to help prosecute defendant, she started to cry.  Again, she said she did not want him to go to prison, but she was afraid for her life.  She did not want a protective order because of the paper trail.

Officer Neveu next spoke to defendant in the patrol car.  After receiving his *Miranda*[3] rights, defendant told Officer Neveu that Sonia was angry with Agent Spigelmyre and tried to file a complaint against her.  Officer Neveu said he knew that was not true because Sonia told him she was not upset with Agent Spigelmyre and it was defendant who was upset.  Defendant admitted he was angry with Agent Spigelmyre because of the things she had told Sonia.  When Officer Neveu asked him about getting physical with Sonia, defendant said he had a bad memory due to medical problems.  Initially, he said he did not remember that night, and then he said he did remember that night, but nothing unusual happened.  In response to Officers Neveu's questions, he said Sonia would never say those things and would never testify against him.  He said he would never let anything come between them, would never let her leave, and would never

---

**3**      *Miranda v. Arizona* (1966) 384 U.S. 436.

4.

let anyone take her away from him.  He appeared to be very stressed and nervous. Officer Neveu arrested him and took him into custody.

That night, defendant called Sonia many times from jail.  She told him she had explained that a puppy had smacked her in the nose when she tried to give it a bath. Defendant said, "That's a good one."  He told her to stick to that story and to stay strong. He said they should be all right.  She reminded him that she told him, "Don't freakin' hit me in my face."  He asked her to say that she was not going to press charges and he asked her to write a letter to the district attorney's office requesting that the charges against him be dropped.  He urged her not to answer questions and suggested she could "plead the Fifth."

Officer Neveu and Agent Spigelmyre spoke to Sonia again the next day.  She had gone back to the apartment, contrary to what Agent Spigelmyre had told her to do.  When Officer Neveu brought Sonia to the parole office, she recanted, claiming she had lied and defendant had never hit her.  She did not want him to go to prison.  She just wanted him to stop using methamphetamine.  She loved him and wanted to be with him.  Officer Neveu suggested they get Sonia's mother on the telephone.  Sonia's mother urged her to tell the truth.  Then Sonia started crying and again admitted defendant had hit her.

When called by the prosecution at trial, however, Sonia recanted.

### Defense Evidence

Defendant's mother testified that defendant lived with her to take care of her.  She did not hear defendant and Sonia arguing or fighting on June 14, 2013.

Sonia testified that defendant had never hurt her.  She denied being tricked into marrying him, and said her parents approved of their marriage.  She explained that she had a permanent bruise on the bridge of her nose and it always looked like that.  She said her bloody nose was caused by a dog that they had for five days.  She had never seen defendant use methamphetamine, and she never told Officer Neveu that he used it.

**DISCUSSION**

*I.*    *Law*

Section 1385 grants trial courts the discretion to dismiss a prior strike conviction if the dismissal is in furtherance of justice. (§ 1385, subd. (a); *Romero, supra*, 13 Cal.4th at pp. 529-530.) A defendant bears the burden of clearly showing the trial court's decision not to do so was arbitrary or irrational. Absent such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives. (*People v. Carmony* (2004) 33 Cal.4th 367, 376-377 (*Carmony*).)

"'… A court's discretion to strike [or vacate] prior felony conviction allegations [or findings] in furtherance of justice is limited. Its exercise must proceed in strict compliance with … section 1385[, subdivision] (a).'" (*People v. Williams* (1998) 17 Cal.4th 148, 158.) The Three Strikes law "was intended to restrict courts' discretion in sentencing repeat offenders." (*Romero, supra,* 13 Cal.4th at p. 528; *People v. Garcia* (1999) 20 Cal.4th 490, 501 ["a primary purpose of the Three Strikes law was to restrict judicial discretion"].) The Three Strikes law establishes "'a sentencing requirement to be applied in every case where the defendant has at least one qualifying strike'" *unless* the sentencing court finds a reason for making an exception to this rule. (*Carmony, supra,* 33 Cal.4th at p. 377.) There are "stringent standards that sentencing courts must follow in order to find such an exception." (*Ibid.*) In order to dismiss a prior strike conviction, "the court in question must consider whether, in light of the nature and circumstances of [the defendant's] present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams, supra,* 17 Cal.4th at p. 161.)

"[A] trial court will only abuse its discretion in failing to strike a prior felony conviction allegation in limited circumstances. For example, an abuse of discretion

6.

occurs where the trial court was not 'aware of its discretion' to dismiss [citation], or where the court considered impermissible factors in declining to dismiss [citation]. Moreover, 'the sentencing norms [established by the Three Strikes law may, as a matter of law,] produce[] an "arbitrary, capricious or patently absurd" result' under the specific facts of a particular case. [Citation.] [¶] But '[i]t is not enough to show that reasonable people might disagree about whether to strike one or more' prior conviction allegations…. Because the circumstances must be 'extraordinary … by which a career criminal can be deemed to fall outside the spirit of the very scheme within which he squarely falls once he commits a strike as part of a long and continuous criminal record, the continuation of which the law was meant to attack' [citation], the circumstances where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme must be even more extraordinary. Of course, in such an extraordinary case—where the relevant factors … manifestly support the striking of a prior conviction and no reasonable minds could differ—the failure to strike would constitute an abuse of discretion." (*Carmony, supra,* 33 Cal.4th at p. 378.)

## II.     *Background*

In defendant's *Romero* motion, he moved to dismiss his 1991 conviction for rape in concert by force and violence (§ 264.1) on the ground that the conviction was 23 years old.

According to the probation report, the facts underlying the 1991 conviction are as follows:

> "[O]n August 21, 1990, Jerry Uribe, accompanied by [defendant], befriended the Confidential Victim (CV, age 18). Uribe offered her a ride to a job interview, and drove around. Uribe went to a liquor store, purchased two bottles of tequila and a six-pack of beer. CV became frightened when Uribe would not return her to her aunt's residence, where she had been staying. Rather, Uribe took her to an empty field, where he dragged her to the back of his truck. When CV kicked and fought off Uribe, [defendant] held CV down, as Uribe inserted his fingers into CV's

7.

vagina. He then got on top of her, raped her for approximately 40 minutes, and ejaculated at least once. [Defendant] got up and vomited, as he was sick.

"CV fled, but Uribe ran after her and tackled her. Uribe carried her back to the truck, where he and [defendant] threatened to kill her and her family if she told anyone what happened. [Defendant] also held a gun to her ribs, but then left to visit a female. Uribe then raped CV again and orally copulated her. CV was able to escape when she jumped out of the truck, and was able to call police from a witness's residence."

Defendant was sentenced to nine years four months in prison, but he was paroled in November 1995.

In denying the *Romero* motion, the trial court stated:

"You know, [defendant], I don't want to say too much here, sir. I'm not here to judge … your life. And I'm not God. I don't pretend to be. And, you know, so this isn't about you as necessarily in some kind of a moral judgment. But, you know, you, through your attorney, have asked me to strike the [prior] strike [conviction]. You pointed out that what happened involved in that kidnap and rape situation was a long time ago and your participation in that. It was a long time ago. But there are truths when you look at this probation report, sir. You've been involved in the criminal justice system since you were 16 years old and right up until as recently as 2012 after a series of parole violations, resisting a police officer and the conduct of an arrest and all of the just kind of overall continuing incidents of violence, primarily within your own family. It's not in the interest of justice for me to strike the strike under the circumstances here, sir. And, therefore, I'm declining your request to do so."

Defendant's probation report to which the court referred shows that his criminal career began when he was only 15 years old and continued until he was arrested on the current offense on June 20, 2013. His 29-year criminal history included the following in chronological order: petty theft, battery, driving under the influence, vehicle theft (followed by a probation violation), kidnapping, rape in concert with force and violence (followed by four parole violations and returns to prison), criminal threats, battery of a spouse, driving under the influence, resisting an officer, vandalism, child cruelty (he kicked his nine-year-old stepdaughter in the head three times, then pulled the telephone

cord from the wall when the child's mother, his wife, tried to call the police), corporal injury to a spouse (he hit and pushed his wife after they argued and he would not allow her to call the police), damage to a telephone power line, vehicle theft, violation of a domestic protective order (he forced his way into his wife's residence, in violation of a domestic violence protective order, while she was at work and her daughter was inside), vandalism, theft, criminal threats (he threatened to kill his wife in front of her children), violation of a protective order, resisting an officer, driving under the influence, petty theft with priors (followed by three parole violations and returns to prison), and resisting an officer. About five months after the last offense, he married Sonia.

Defendant now argues that the court abused its discretion when it refused to dismiss the prior strike conviction because the evidence showed that in the current crime he punched Sonia just once in the heat of an argument, she did not want to press charges and did not report the incident to the police, he was remorseful and apologetic, and he and Sonia were still together. He explains: "Thus, most people would agree that [his] prison [sentence] did not need to be doubled under the three strikes law simply for his commission of the current offense."

Defendant stresses that he committed the 1991 offense 23 years before the current offense when he was only 21 years old, and he was merely an aider and abettor. "Thus, this prior conviction itself did not justify a finding that [he] fell within the spirit and intended purpose of the three strikes laws, which was to get violent repeat offenders off the streets." He says his other crimes appeared to be related to his "anger issues, drug addiction, and depression," and were not serious enough to bring him within the spirit of the Three Strikes law. He argues he could do some good upon release from custody because he could continue caring for his disabled mother. He asserts that, had the trial court dismissed the prior conviction, the court could have imposed a five-year term, which "would have been a more just sentence for the current conviction."

### III.    *Analysis*

This is not the extraordinary case imagined by *Carmony*, where there can be no doubt that the defendant, although a career criminal, nevertheless falls outside the spirit of the Three Strikes law. (*Carmony, supra,* 33 Cal.4th at p. 378.) Absolutely nothing about defendant's case suggests, much less compels, such a conclusion. Indeed, as the People state, defendant's criminal history is appalling. He is a lifelong criminal who has been utterly refractory to rehabilitation and appears to have no desire to reform or change. He has been in and out of juvenile hall, jail, and prison for almost three decades and has performed poorly when out on probation or parole. He seems to be precisely "'the kind of revolving-door career criminal for whom the Three Strikes law was devised.'" (*People v. Strong* (2001) 87 Cal.App.4th 328, 340, fn. omitted.) Furthermore, his recurring violence and dominance toward females, including a nine-year-old girl, is particularly abhorrent. Thus far, the state's repeated efforts to rehabilitate him have clearly failed. In our opinion, defendant falls squarely within the spirt of the Three Strikes law, and the trial court acted fully within its discretion when it denied his motion and sentenced him under that law. Contrary to defendant's claim, most people would *not* agree that he should not be sentenced pursuant to the Three Strikes law—a law that punishes him not only for his current offense, but for his decades of recidivism.

### DISPOSITION

The judgment is affirmed.